IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

GUMARO BAEZ,

    Petitioner,

v.

WILLIAM MUNIZ, Warden, Salinas Valley State Prison,

    Respondent.

No. C 15-01722 WHA

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## INTRODUCTION

Petitioner, a state prisoner represented by counsel, moves for collateral relief under Section 2254. For the reasons stated below, the petition is **DENIED**.

## STATEMENT

Petitioner Gumaro Baez is currently incarcerated at Salinas Valley State Prison in Soledad, California. Pursuant to Section 2254 of the United States Code, he moves for a writ of habeas corpus vacating his California state court conviction. Petitioner is represented by counsel.

In 2011, a jury convicted petitioner of two counts of first degree murder, two counts of attempted murder, and one count of attempting to dissuade a witness. The jury acquitted him of a murder charge from a different homicide that had occurred earlier. In 2012, petitioner was sentenced to two consecutive terms of life imprisonment without the possibility of parole for the

murder and attempted murder charges. The sentence included a consecutive term of 100 years to life for the firearm enhancements on the murder and attempted murder counts as well as a concurrent 12-year term for the attempt to dissuade a witness charge. The California Court of Appeal affirmed the trial court's judgment of conviction and the California Supreme Court denied review.

In brief, petitioner was convicted of murdering two people and attempting to murder two others, in apparent retaliation for his brother's death the year before. The following factual summary comes from the opinion of the California Court of Appeal's decision (Gov't Exh. 6), which summary is presumed correct under 28 U.S.C. 2254(e)(1):

> On February 3, 2008, Isaac "Ike" Johnson and a friend Devonne "Von" Hayward were watching the Super Bowl at the home of Hayward's brother, Rudy. They smoked marijuana cigarettes during the game. After the game, Hayward and Johnson drove Hayward's Chevrolet van around East Oakland. During this time Hayward saw defendant, a friend, along with Devashawn "DVD" Walker. DVD is Black and defendant Hispanic. Hayward gave the two men a ride in the van.
>
> This date was the one-year anniversary of the death of defendant's brother, Adiel "Dilio" Meza, who had been shot by a police officer. Hayward and Johnson were friends of Dilio and each had a tattoo stating "rest in peace, Dilio." However, Hayward learned that defendant suspected he was responsible for the death of Dilio.
>
> Upon entering the van, defendant sat directly behind Hayward, the driver, and Walker was behind passenger Johnson. The group drove to San Leandro to pick up teenagers Melissa Jackson and Dominique Hooper. The girls, who were cousins, sat on the rear bench of the vehicle. The plan was to drop the girls off at a music studio in Oakland.
>
> Eventually, Hayward stopped the van on Havenscourt, near East 14th Street in Oakland. As he prepared to drive away, shots were fired from inside the van. Johnson indicated nothing really took place before the shooting. There had been no angry words. Johnson was hit first by bullets. Johnson believed the bullets came diagonally from the left rear of his position. This was the location of defendant in the van. Johnson believed defendant was the shooter because of the angle at which he was hit, and because he was not shot in the back of the head directly. Johnson was hit in the left side of his neck and left shoulder at the top of his arm. In an effort to escape, Johnson jumped out of the moving van, sustaining a broken arm in the process. Once outside the vehicle, Johnson heard more shots in the van.
>
> It seems defendant fired at Hayward next. Hayward was hit in the back of the neck, on the left side. Once hit, Hayward was unable to move his arms or legs. He was subsequently put on basic life support by medics at the scene. Defendant then shot Dominique Hooper in the chest and Melissa Jackson numerous times. In fact, she sustained 15 separate wounds. One entered her ear and exited her upper lip. While defendant did the shooting, Walker took control of the van and

2

headed toward the area where defendant and Walker lived. The van crashed into a parked car at Outlook Avenue and 65th Avenue.

A witness, Jonathan Clancy-Tone, heard the crash. Clancy-Tone saw an Hispanic male, later identified as defendant, standing by the van, close to a streetlight. The witness heard defendant yelling at Walker, "You crashed the car." Clancy-Tone asked Walker if he needed assistance as the latter was standing outside the driver's side of the van. Both defendant and Walker ran from the scene toward Seminary, near each man's home.

Looking inside the van, Clancy-Tone saw three people. Hayward was on the floorboard between the driver's and front passenger's seats, feet tangled in the pedals of the van. The body of Melissa was on top of Hayward's left arm. Dominique Hooper appeared alive at the time, but she died at the scene.

Oakland homicide investigators spoke with victim Johnson at Highland Hospital. At first, Johnson stated he did not know the persons picked up by Hayward in the van. At the preliminary hearing, Johnson did not identify defendant as the shooter in the van.

Later, however, Johnson did state defendant was the man behind Hayward and that Walker was the person who sat behind Johnson. During these meetings, Johnson expressed the fear he had about disclosing the identity of defendant and possible retaliation he might suffer. Sobbing, he indicated a fear his life would be on the line for talking. At the trial, Johnson indicated the talk on the street was that "something might happen to me, something might happen to my family." Even at the preliminary hearing, Johnson indicated this fear prevented him from initially telling the entire truth to the police.

At first, homicide personnel could not speak with Hayward because of his medical condition. He had tubes down his throat and was hospitalized for three or four weeks before being released to a rehabilitation center. When released, he needed a wheelchair and then a walker to move about. Eventually police obtained a statement from Hayward. At the trial, Hayward still had not recovered fully from his wounds. His left leg and arm were limited because of his wounds. He had to wear a brace and was not able to work. Hayward testified at trial he did not know who shot him, recalling nothing about the incident in the van. However, the prosecutor then played audiotapes of Hayward's conversations with police inspectors for the jury. Information provided by Hayward during these taped police interviews was his personal recall. In the tapes, Hayward stated that Johnson was the first person shot by defendant. After that, defendant, directly behind Hayward, shot him. The angle of his injuries supported his opinion, since the bullet entered the left side of his neck.

The van itself was the home of considerable ballistic evidence, including cartridge cases, fired bullets and jacket pieces. Firearms expert Mark Bennett concluded the bullets and casings were each fired by the same nine-millimeter Luger weapon. He also concluded the same weapon was used to kill Terrance Brown approximately 48 hours before the shooting in the van.

Defendant was arrested by police on February 6, 2008. While conducting a search of his home, police found several items of ammunition, including the type used in the shooting incidents, namely Remington and Winchester nine-millimeter Luger ammunition. At the Terrance Brown homicide scene, "RIP Dillio" and "6400" were written in the condensation on the hood of a vehicle. A group that dealt narcotics and committed other crimes on the 6400 block of

3

MacArthur in Oakland was known as "6400." Terrance Brown was the half-brother of a lieutenant in the Oakland Police Department.

A beanie was found at the scene of the Brown homicide. DNA analysis linked the beanie to Walker. The probability of a random DNA match between the beanie DNA and Walker was one in quadrillions.

Danny McNary was arrested on May 25, 2009. He was 22 at the time and arrested for robbery. He was booked into Santa Rita Jail. Importantly, he had known defendant since he was six years old and the two were close friends. McNary also knew Dilio and another brother of defendant, Javier (Javi), who was also in custody at this time. While in custody, McNary received a jailhouse letter, also known as a "kite," from defendant. Defendant wanted to know if McNary wanted some food. Passing of kites among inmates is done by other inmates, acting as custodians.

At trial, McNary identified People's exhibit No. 53B as the initial kite he got from defendant. He did not recall if he advised police about this letter.

McNary did recall providing Sergeant Cruz with a second kite in an envelope. At trial, the witness admitted he wrote this kite himself, and not defendant. McNary testified Sergeant Cruz told him what facts to put in this second transmittal. At the preliminary hearing, McNary testified defendant sent this kite labeled exhibit No. 4. Of course, McNary testified he told police and the prosecutor he feared for his safety after turning over the kites.

McNary related he was in custody on the day of the van shooting. He did not see any police reports on the shooting incident regarding defendant's case or Dilio's shooting. He did not know the identity of the officer who shot Dilio. Audiotapes of his interview with the police were played to the jury as exhibits Nos. 47A, 48A, and 49A. Transcripts were provided but not admitted.

The tapes along with the testimony of Sergeant Cruz contradicted the testimony of McNary at trial. This evidence showed that on May 26, 2009, the witness contacted homicide officers and suggested he had information concerning defendant's case. Sergeants Cruz and Van Sloten visited McNary on May 26, 27, and June 2, 2009. Cruz testified he has a policy when interviewing witnesses such as McNary not to disclose any details of a case, and he specifically refrained from such disclosures with this witness.

During the interview of May 27, McNary told Cruz he spoke with others and learned defendant committed the murders in the van as revenge for the death of his brother Dilio. Defendant believed Hayward was responsible for the death because he did not give Dilio a ride home the night he died. McNary said he learned defendant shot Hayward, Johnson, and the two girls. The two girls were killed to avoid having witnesses. McNary also stated that Derek "Little D" Powell told him that defendant was in "D pod" next to Powell. At the time, McNary was in "C pod" and eventually got moved to "A pod" when he received his first kite from defendant.

The first kite McNary got from defendant stated: "D-Ray. What's up Bra? I just found out you in A pod. I'm gonna send you some food. Write me back right now Bra and tell me what cell you in so I can tell the pod worker to send it to you. Bra Bra. Shit, You know (Rudy) over here. That nigga hella scary. When he seen me it was like seein' a ghost. I woulda got him, but I'm gonna use him to get to Von. Feel me? I'm trying to get out. Pumpin' fear in these niggas' hearts.

4

This nigga know I shot his partner and scared fuck. This nigga scared fuck. Fuck this nigga though. What you in here for Bra Bra? Try to get over here with Lil D and me. Shit. Hopefully, Lil D go home tomorrow. Love you Bra Bra."

McNary indicated that Hayward is referred to as "Von" on the street, and that Lil D is Derek Powell. McNary also stated that Rudy is Hayward's brother. Saying Rudy is "scary" means that Rudy is afraid of defendant.

Cruz then asked McNary if defendant expected him to respond when he told McNary to write him back. McNary believed defendant did want a reply by the witness. Cruz then advised McNary that if he responded, he should not ask any questions regarding this case. "[D]o whatever normal activity . . . that you would normally do." If McNary learned of any further retaliation to those outside, he needed to alert Cruz.

Based on the disclosures by McNary concerning retaliation, Cruz obtained a search warrant for the cells of Derek Powell and defendant, which were served on June 2, 2009.

While executing the warrants at the jail, an officer alerted Cruz that McNary had received another kite from defendant. In a tape presented at trial, McNary told Cruz about the contents of the second kite: "Bra what's good? Yeah, though you could see it all in Tube's eyes, I ain't gonna get nothin' out of it if I get down with him. All I can do is have him get to Von or somethin' but shit, Bra, cuzzo had that comin' to him that night. . . . DVD, Mac and me walkin' to the store right? We see cuzzo in the van. Mac like, 'Let me see the thing.' So I hand him the thing. Mac gonna shoot in the air. Bra so I got hella mad so later, I see cuzzo. It's me and DVD. I wave him down. I play it cool like 'Bra, what's up? Let's get a bottle.' So we bounced in so I'm like, my first chance, I'm on him. This nigga bounced on the way way. Next thing I know, two bitches bounce in so I'm like, 'Fuck.' So he ridein' and this nigga parked on Havenscourt just out of the blue so then I say, 'Bra, why big Bra didn't get home that night?' This exactly what he told me. 'I don't know. The nigga was high.' He ain't give a fuck so Ike started laughing at that. So then I look at DVD, right? I give him that look and the next thing you know, Von catch one through the neck. God was with him. Like as soon as the trigger was getting squeezed he jerked up to — at that moment to cut on the van and soon as I thought he was dead, everybody had to go. Bra, Ike catch one to the side of his neck. Like soon as the bullet hit him, he fell out the van. He knew that shit was comin'. After that, mother fuckers had to make sure the bitches was gone. By the time they stop screamin', the bullets ran out. The whole time DVD was driving. That nigga was nervous. He drivin' hella dumb so these niggas slap on 65th so we bounce out and cut. I thought Von was dead. As soon as he got shot, his body was lifeless but if — if the broads were still alive, it would've really been over. Everybody know you can't leave witnesses so the outcome was Von and Ike stayed alive. Now both of them niggas givin' statements on me. They left hella shit out but they say I did it. Bra if them niggas get on the stand, its ugly. I don't think I'm ever gettin' out. Shit, they talkin' about the death penalty."

McNary disclosed to Cruz the above kite came in a sealed envelope. He gave Cruz this item along with the kite. Subsequent DNA analysis of the saliva on the envelope matched defendant's DNA, with a probability ratio of one in one sextillion.

The defense played a tape of an interview of McNary with its investigator made on September 20, 2011, wherein McNary acknowledged he made up a lot of

5

information in the kites to help him receive a better deal from the district attorney. He acknowledged he wrote the second kite and not defendant; the second kite was passed to Cruz on June 2, 2009. McNary met with the defense investigator to clean up what he did.

During the trial, the prosecution confronted McNary regarding his statements to the defense investigator indicating he was the author of the June 2 kite. The district attorney played a tape made by Inspector Harry Hu and McNary after McNary acknowledged at his October 13, 2011 hearing that he, not defendant, created the second kite. McNary did not know his conversation with Hu was being recorded. In it, McNary indicated he was making the retractions for the good of his family, especially his son. He was concerned that someone would confront him or his child on the streets and told Hu, "I don't know where it's gonna to come from. . . . I'm looking out for my son." McNary described the brother of defendant, Javi, as "the type of person where if I got into it with his brother [(defendant)], and he can't get me, he's gonna get my family." Inspector Hu then asks McNary, "So what you're doing is just protecting yourself. . . . Protecting your son and your family." And McNary replies, "Yeah."

The jury was allowed to compare the handwriting of defendant and McNary along with the two kites received in evidence. Sergeant Cruz was allowed to state the handwriting in the two kites were similar and each kite contained similar details and phrases.

Besides the two kites described above, the prosecution introduced papers found during a search of Derek Powell's cell. A birthday card was found containing a sheet of paper with "BGL-747 Gumaro Baez" (defendant's jail number) and two other letters. One of the letters was addressed to "Randa." Miranda Smith was the girlfriend of defendant. In the first letter, defendant wrote: "Randa this the get down. They charged DVD with the shit I'm charged with, and another murder. They found his hat at that other murder scene. The reason they linked the murders is because ballistic tests show the same gun was use at both the scenes. Feel me. The only reason I'm still in here is because Von & Ike statements, and I'm not positive DVD gave a statement on me. I thought he was the confidential informant. It really don't matter if he saying I did it cuz if he is, it's go look like he trying to save his self. Baby if Von & Ike don't come to court I'm go be home soon. . . . Without their testimony they ain't got shit on me." He goes on to point out it all depends on Von and Ike not taking the stand.

A second letter in the card indicated that Miranda should help create a false alibi for defendant during the weekend Brown was killed and the van shootings took place. In the first part of this letter, defendant advises "Baby" about the alibi. "Baby this just in case OK. My lawyer said you ain't gone have to because the case is weak if the witnesses don't show up, witch they not. (Ike & Von). But it's always good to stay prepared. If they still try to ask my whereabouts this matches the timing with you, Jonique, me & Bitch ass. . . . Tell Jonique that too blood. Like I said I don't think ya gone have to but we got to stay two steps ahead of these crackers."

Defendant then proceeded to dictate the alibi for the weekend crimes. "I was with my Husband all Friday, Saturday, Sunday. I came over Friday after school. Only time he'll drop me off to get dress. He dropped me off Saturday morning, and Sunday morning, and soon as I finish getting dressed he'll come pick me up. I recall Sunday we was drinking (me, Jonique and his friends . . . DVD, Kyn, Derek, Mac, Rob). My sister came and picked me & Jonique up at around 11–11:30 because I had school in the morning. She told me she was go come get

me at 11 no matter what. So she did. So when I got home I thought if I asked my husband to come spend the night. I text message his phone a couple times. He said he texted me back but I never receive his message. But I remember like around 1 or something he knocked on my door. And he spent the night. I don't remember who dropped him off. I didn't ask I was with him all Monday, Tuesday, and Wednesday . . . . PS Babe try to remember the best you can what you told the police and don't try switching it up. Member they recorded you. Study it. It like a test. Matter of fact harder. Just in case OK Randa. Love you. Memorize that time 11–11:30."

The prosecution introduced phone records between Miranda Smith and defendant showing that she repeatedly called defendant 20 minutes before the van murders. Her unanswered calls to defendant were made from her home in Alameda.

The defense presented no witnesses. Instead, counsel contended Walker shot all the victims in the two crime scenes, and defendant had no responsibility for any shootings. Defendant was the "victim" of growing up on Oakland streets. He argued McNary authored both of the kites he provided police.

## ANALYSIS

### 1. STANDARD OF REVIEW.

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law, as determined by the United States Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. 2254(d).

The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court, which in this action is that of the California Court of Appeal. *Barker v. Fleming*, 423 F.3d 1085, 1091–92 (9th Cir. 2005). AEDPA imposes a "highly deferential" standard for evaluating state court decisions. *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."

7

*Harrington v. Richter*, 562 U.S. 86, 102 (2011). "If this standard is difficult to meet, that is because it was meant to be." *Ibid*.

Under the "unreasonable determination of the facts" clause, a state court's ruling based on a factual determination must be "objectively unreasonable in light of the record" to warrant habeas relief. *Miller-El v. Cockrell*, 537 U.S. 322, 348 (2003). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).

Petitioner argues that the California Court of Appeal's decision should not be afforded deference under AEDPA because the decision made an unreasonable determination of the facts. If a federal court finds, in reviewing a habeas petition, that the state court made an unreasonable determination of the facts, then the claim must be evaluated de novo. *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014). "To find the state court's fact finding process defective in a material way, or, perhaps, completely lacking, we must more than merely doubt whether the process operated properly. Rather, we must be satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." *Ibid* (internal quotations omitted).

Here, petitioner finds fault with the California Court of Appeal's statement that "[e]ssentially, [Detective] Cruz advised [McNary] to accept any kites transmitted by defendant but not to send notes himself to defendant so as to trigger additional kites" (Br. at 30). Petitioner argues, however, that the recorded interviews show that Detective Cruz told McNary that, in response to the first kite, he should "do whatever activity . . . that you would normally do" and "write him back in whatever fashion you want," but that McNary should not "ask any questions about this case" (*Ibid*). In sum, petitioner argues that the inconsistency between these statements warrants all AEDPA deference being thrown out the window.

Petitioner's argument fails for several reasons. As an initial matter, the language from the Court of Appeal's decision that petitioner complains about comes not from the decision's legal analysis, but from its description of Detective Cruz's testimony at the evidentiary hearing.

8

This description was largely accurate. At the hearing, Cruz testified as follows (Gov't Exh. 2 at 135–36):

> A: I thought there was a possibility more kites could be coming to McNary.
>
> Q: That wasn't something that you were interested in discouraging; isn't that correct?
>
> A: Well, sir, in a manner I did, in that I told Mr. McNary that if he did write a kite, not to talk about the case. I told Mr. McNary that I wasn't going to move him to where Baez was. I still kept it difficult, or as difficult as it can be, for a kite to get to him. So, I did to a point. However, I knew that just by McNary being there and the desperate nature that had appeared to me Mr. Baez was in, that he may send him another kite, to try to get another kite to him through doors, or whatever, but my discouragement of him participating in writing to Baez and talking about the case itself. So, in a way I did discourage him, but I knew that it could still happen.

Petitioner's issue essentially boils down to this: The evidentiary record and transcriptions of the recorded interviews show that Detective Cruz told McNary that, after receiving the first kite from petitioner, he should do whatever he would normally do in response, but that he should not ask any questions about petitioner's pending case. Yet, one sentence of the Court of Appeal's decision, in the section summarizing Detective Cruz's testimony at the evidentiary hearing, states "essentially, Cruz advised the witness to accept any kites transmitted by defendant but not to send notes himself to defendant so as to trigger additional kites." From the exchange quoted above, however, the Court of Appeal's summary of Cruz's testimony did not amount to an unreasonable determination of the facts, as Cruz clearly indicated that he did discourage McNary from responding in some manner.

Moreover, in other parts of the decision, the Court of Appeal describes the facts exactly as petitioner contends they occurred. Specifically, in the "Statement of the Facts" section, the decision states (Gov't Exh. 6 at 7): "Cruz then asked McNary if defendant expected him to respond when he told McNary to write him back. McNary believed defendant did want a reply by the witness. Cruz then advised McNary that if he responded, he should not ask any questions regarding this case. '[D]o whatever normal activity . . . that you would normally do.'"

Furthermore, the stray sentence that petitioner cherry picks as being an unreasonable summary of the facts must be read in context of the entire paragraph, which states as follows (*id.* at 14–15) (emphasis added):

9

> At the initial meeting on May 26, 2009, Cruz obtained the kite from McNary. McNary advised Cruz he received it from defendant. Based on the note, Cruz became worried about the witness's safety. He obtained search warrants for the cells of defendant and Derek Powell. Cruz testified he did not ask McNary to obtain more information regarding defendant and his role in the crimes. He did not promise McNary any leniency for his assistance. He did advise McNary he would tell the prosecutor in the pending robbery case that McNary had been cooperative and should receive consideration. He never had or suggested McNary be wired and meet defendant or be placed in a cell closer to the accused. *Essentially, Cruz advised the witness to accept any kites transmitted by defendant but not to send notes himself to defendant so as to trigger additional kites*.

Based on the context of the rest of the paragraph, one could reasonably interpret the last sentence to mean only that Cruz advised petitioner not to send additional notes *relating to petitioner's case*, so as to trigger additional kites in response. While perhaps ambiguous, the existence of the last sentence in the above quoted paragraph does not render the entirety of the findings to be so unreasonable that all AEDPA deference should evaporate.

### 2. PETITIONER'S *MASSIAH* CLAIM.

In *Massiah v. United States*, 377 U.S. 201 (1964), the Supreme Court held that once a defendant's right to counsel had attached, any statement that a government informant deliberately elicits, in the absence of counsel, is inadmissible at trial. To establish a *Massiah* violation, a defendant must prove that the informant (1) acted as a government agent or was under the direction of the government pursuant to a preexisting arrangement, with the expectation of some resulting benefit or advantage and (2) that he deliberately elicited incriminating statements. *United States v. Henry*, 447 U.S. 264, 270 (1980). This means that "the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986).

Here, the California Court of Appeal's denial of petitioner's *Massiah* claim was not "objectively unreasonable," such that habeas relief is warranted. Petitioner first raised his *Massiah* claim before trial. As detailed in the statement of facts above, Danny McNary, a fellow inmate and an old friend of petitioner, received a kite from petitioner, which offered to send McNary some food, stated that petitioner was trying to get out of jail soon, and would be "[p]umpin' fear in these niggas' hearts." After receipt of this kite, McNary contacted jail

10

officers to tell them he might have some helpful information about petitioner's case. Sergeant Cruz, the lead investigator on petitioner's case, visited McNary in jail for an interview. Cruz advised McNary to respond to the first kite in whatever way he normally would, but stated that McNary should not ask any questions about the pending case. Cruz never made any promise of leniency for additional help from McNary, but stated that he would contact the prosecutor on McNary's case and advise that person of what McNary had done. A few days later, after McNary responded, petitioner sent McNary a second kite, essentially containing a full confession. Based on these facts, petitioner argued that McNary had been a government informant, that he had deliberately elicited the second kite from petitioner, and that the second kite should thus have been suppressed.

In response, the state trial court held a full-day evidentiary hearing on the *Massiah* issue. After hearing the testimony, the trial court concluded (Exh. 6 at 15–16):

> [It] simply was not the case that Danny McNary . . . was induced by law enforcement officers to attempt to obtain incriminating statements . . . from the defendant [or that] McNary was acting as an agent of law enforcement. Sergeant Cruz never in any way instructed or provided Mr. McNary with any direction about additional ways or means by which to solicit additional incriminating information from Mr. Baez about the pending case.

The trial court went on to state that although McNary hoped he would receive some consideration for his help, "hope is not synonymous with an overt promise or an overt expectation that some benefit will be derived by passing on any additional information, particularly in the context of the information that Sergeant Cruz was looking for" (*ibid*).

The California Court of Appeal affirmed. After a thorough discussion of *Massiah* and its progeny, the opinion held that McNary never become an agent of the government and also that McNary never deliberately elicited incriminating statements from petitioner. As to agency, the appellate court specifically noted that McNary and Cruz had no preexisting relationship, McNary had not served as an informant before, McNary initiated the initial contact, Cruz never made any promise of leniency, and Cruz never paid McNary for his assistance (*id*. at 16). Furthermore, the opinion found that McNary had not deliberately elicited incriminating statements and his return kite asking for food had been akin to "mere listening." As the Supreme Court has clearly held, to establish a *Massiah* violation, a defendant must establish that the informant made some effort

11

to "stimulate conversations about the crime charged." *Kuhlmann*, 477 U.S. at 472. The California Court of Appeal's findings that McNary did not act as a government agent and did not deliberately elicit incriminating statements were not "objectively unreasonable."

In arguing that the California Court of Appeal's decision involved an unreasonable application of clearly established federal law, petitioner largely on the Supreme Court's decision in *United States v. Henry*, 447 U.S. 264 (1980) and our court of appeals' decision in *Randolph v. People of the State of California*, 380 F.3d 1133 (9th Cir. 2004). In *Henry*, government agents recruited a paid informant who had been housed on the same cellblock as the defendant. The agents instructed the informant to be alert for any statements made by federal prisoners. The informant engaged in a conversation with the defendant, who made incriminating statements, which were admitted at the defendant's trial.

*Henry* is distinguishable. As an initial matter, the informant in *Henry* was paid by the government. McNary, our informant, was not paid by the government to obtain information. Furthermore, in *Henry*, the government specifically recruited the informant and told him to listen for potentially incriminating statements. Here, in contrast, McNary approached the police, telling them that he might have helpful information. Lastly, in *Henry*, the informant had been placed on the same cell block as the defendant, such that face-to-face conversations would be likely. In our case, in contrast, Sergeant Cruz did not ensure McNary would be assigned to petitioner's cell block. Rather, they remained apart, such that it would be much less likely for McNary to actual illicit incriminating statements. Accordingly, the California Court of Appeal's determination that *Henry* did not apply to petitioner's case was not objectively unreasonable.

*Randolph* is similarly distinguishable. In *Randolph*, the defendant's cell mate sent a letter to prosecutors asking for lenience and stating that he was Randolph's cell mate. Government agents met with the cell mate, discussed a plea deal for him, and discussed his potential testimony against Randolph. The government agents sent the informant back into the cell with Randolph and the informant obtained incriminating statements. The district court denied Randolph's habeas petition. Our court of appeals reversed, sending the case back to the district for more fact finding, because the record had been unclear regarding the extent to which

1    the cell mate had actually elicited statements.  Importantly, our court of appeals did not hold that

2    Randolph's *Massiah* rights had actually been violated.  On remand, the district denied

3    Randolph's *Massiah* claim, which our court of appeals affirmed.  *Randolph v. California*, 396 F.

4    App'x 432 (9th Cir. 2010).

5         As an initial matter, *Randolph* was a pre-AEDPA case, and thus our court of appeals

6    applied a much less deferential standard to the state court's findings.  Moreover, in *Randolph*,

7    the informant had been the defendant's cell mate, and thus could have much more easily elicited

8    incriminating statements.  Furthermore, in contrast to our case, the informant in *Randolph*

9    actually discussed a plea deal with prosecutors.  Lastly, as stated above, our court of appeals

10   eventually found that there had not been a constitutional violation in *Randolph*.  Thus, the

11   California Court of Appeal's holding that *Randolph* was distinguishable from our case did not

12   rise to the level of being objectively unreasonable.

13        **3.    PETITIONER'S SUFFICIENCY OF THE EVIDENCE CLAIM.**

14        Petitioner claims the California Court of Appeal unreasonably applied Supreme Court

15   precedent in denying his sufficiency of the evidence claim in regards to his conviction of

16   attempting to dissuade a witness.  The evidence presented at trial is insufficient to support a

17   conviction when "viewing the evidence in the light most favorable to the prosecution, any

18   rational trier of fact could have found the essential elements of the crime beyond a reasonable

19   doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  Sufficiency of the evidence claims "face

20   a high bar in federal habeas proceedings because they are subject to two layers of judicial

21   deference." *Coleman v. Johnson*, 132 S.Ct. 2060, 2062 (2012) (per curiam).

22        The California Court of Appeal denied petitioner's sufficiency claim, finding that the

23   jury had been presented with plenty of evidence for it to convict on the attempt to dissuade a

24   witness charge.  Specifically, the California Court of Appeal found the following evidence to be

25   sufficient (Gov't Exh. 6 at 18–20):

26   > Here, defendant wrote the first kite to McNary, and two other kites were found in the cell of Powell, each indicating defendant could avoid conviction if Hayward
27   > and Johnson did not testify against him.  Powell was about to be released from custody with this information.  Hearing this message alone would be "Pumpin'
28   > fear in these niggas' hearts." When defendant sent the first kite to McNary, he described his jailhouse encounter with Hayward's brother Rudy.  Defendant tried

to get Rudy to dissuade Hayward from testifying. "This nigga know I shot his partner . . . . This nigga scared fuck." McNary noted that Rudy told him that Hayward would not come to court because they would "rather handle somethin from the streets." Johnson told the police he was afraid to testify because he heard on the street that something would happen to him or his family. Sergeant Cruz found the kites in Powell's cell, one of which included defendant's message to his girlfriend: "Baby if Von & Ike don't come to court I'm go be home soon. That's all I need to get out . . . . Without they testimony they ain't got shit on me." And defendant was in no rush to achieve this goal. "Baby the only reason I ain't rushing this is because I need to be positive. Von & Ike ain't coming to court. . . . This my life and I need to be prepared for whatever. Ten steps ahead of these mothafuckas. . . . My lawyer said without Von & Ike they ain't got no case . . . . I should be home soon." Other remarks support this theme in the kites.

The finding that these facts adequately supported the jury's verdict was not objectively unreasonable. To convict on this count under California law, the jury had to find that defendant took steps beyond mere preparation that were "intended to affect or influence a potential witness's or victim's testimony or acts." *People v. McDaniel*, 22 Cal.App.4th 278, 284 (1994). Petitioner argues that no rational jury could have found that he did anything more than mere preparation. Not so. Clearly, petitioner recognized that he could benefit if Heyward and Johnson did not testify. A rational jury could find that his message to Powell in this regard, who was about to be released, would "pump[] fear" into those potential witness's hearts, especially considering petitioner's dangerous and desperate situation. This reality came to light when Johnson testified that he had heard on the street that, if he testified, "something might happen" to him or his family (Gov't Exh. 6 at 4). Furthermore, petitioner's letter to his girlfriend, essentially telling her to invent a fake story, clearly "intended to affect or influence a potential witness's or victim's testimony or acts" *McDaniel*, 22 Cal.App.4th at 284. Accordingly, the California Court of Appeal's finding that a rational jury could have found that petitioner's actions went beyond mere preparation was not objectively unreasonable.

## CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is **DENIED**. Judgment will be entered separately.

**IT IS SO ORDERED.**

Dated: May 12, 2016.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

14